May it please the court, Lauren Eskenazi for Petitioner Abacuc Guevara. Like the case that was just argued, this is a Confrontation Clause case. However, really the only issue here is whether the unconstitutional admission of a preliminary hearing statement which violated the Constitution was in fact harmless under BRAC and under the AEDPA. I think of primary importance here, not just to this specific case but actually a problem in the state courts in general, is that the state court opinions often and often apply a substantial evidence test to the prejudice analysis. And that's a huge problem in this case and a bigger, really a bigger problem in the California courts. It's really important that we address this issue. You know, when I saw that in your brief and I went back and I read the California decision again and I see how you could draw that conclusion but I don't think it's necessarily accurate. It seems to me what the California Court of Appeals set forth was equally applicable to either a Jackson against Virginia analysis or a harmless error analysis. You know, the test is different but the considerations that you lay out would be the same. So I'm not sure this is the case to make that point. I appreciate that feedback, but I think that it is and here's why. The ideas in this, the identifications in this case were extremely problematic. And rather than evaluate the strengths and weaknesses of each identification, the court simply said because the identifications were admissible and because they were admissible, then, you know, the jury had every right to make its decision based on those identifications and therefore it's not harmless. And in fact, just one specific quote that's so critically important in the Court of Appeal opinion at ER6667 is where when they say, we conclude as discussed above that the testimony of Poplin and Munez were properly admitted at trial. Therefore, we must, must, and that's wrong if you're applying Chapman. Must is only applicable if you're doing a substantial evidence test. We must conclude that any error in admitting April Romero's preliminary hearing testimony and her statement to the police was harmless beyond a reasonable doubt. So they used the language of Chapman beyond a reasonable doubt, but it's absolutely crystal clear because of this must. One, with the way they framed the issue, that is, because the identifications were admissible, there's no harmless error. And two, the use of the word must absolutely conclusively shows that they used a substantial evidence standard here and not the Chapman standard. Go ahead. Well, I guess it seems to me that's pressing the point just one notch too far. Why can't we read that to say we are compelled to conclude? We must conclude. Well, compelled suggests that we're convinced and we have the discretion to make this call. Must suggests by law we have no other choice other than to make this conclusion. And they did have the discretion. They didn't have to decide that it was harmless, that it was harmless error. They had discretion to or they could have been compelled to based on really ends up being very demonstrative, one. And two, it's also how they frame it. They never discussed the weaknesses of the identifications. And the weaknesses of the identifications are glaring in this case, glaring. We have in the middle of trial the prosecution just talks to a witness who was talked to at the scene of the crime, who saw the shooter, and was able to saw the shooter, knew the petitioner, excluded the petitioner as the shooter. And then over a year later in the middle of trial, we hear about some 10-year-old girl who says it was Abacook, it was Abacook. And that's admitted. Now, maybe that's admissible. But that's a very suspicious, problematic, questionable identification. And yes, the jury had every right to rely on it and make their determination. But when you're doing a harmless error analysis, you have to point out that that is a very weak identification, a very suspicious identification. Well, counsel, if we're applying the Brecht standard, you would have to establish that there was a substantial and injurious effect of the admission of this testimony. Wasn't there plenty of other testimony and evidence sufficient to sustain the conviction here? Well, yes, there was evidence to sustain the conviction, but that's not the test under Brecht and that's not the test under Chapman. Even under a substantial injurious prejudice test, you still have to weigh which is Brecht. If you look at all the evidence absent April Romero's testimony, it all is extremely problematic. It doesn't mean that the jury couldn't have reached, it's not that there wasn't substantial evidence, but you have to look at what was the weight of April's testimony. Was that the piece of evidence that helped the jury quintessentially resolve the conflicts of identification? As long as the evidence is sufficient, it's up to the jury to decide, is it not? I mean, the weight is something that the jury will take into consideration, I would expect. With all due respect, Your Honor, that really was how the state court framed the issue, and it is the wrong application of law. It's not a substantial evidence test. And that's the problem I have with the response you just gave to Judge O'Scanlan's question. It seems to me that that is quintessentially the problem, that as opposed to looking at what evidence was properly admitted and which may or may not have problems with it, and I fully appreciate that your position is that all of the other evidence had problems that made it wobbly. Isn't our task to look at the evidence that was incorrectly admitted under the Confrontation Clause and determine how much effect that had? In other words, to focus on April O'Meara's testimony. Isn't that the point? Well, you want to do both. I don't think you're limited to one type of analysis when you're trying to figure out whether the error was harmless or not. I'm looking at the Ocampo case, and there are five factors that the case identifies that we have to look to per Judge O'Scanlan's question, right, to determine whether there was a substantial and injurious effect as a result of this improperly admitted testimony. And then there are three other factors that really go to, that just drills down on the corroborative evidence, the other four witnesses in this case. And it says, while corroborative evidence may, as a general rule, make the wrongful introduction of other evidence harmless, this concept has no application where, and it gives three instances where there's no application. One, there's a reason for the jury to doubt the only eyewitness testimony. Two, the third-party testimony was not exceptionally strong. And three, the physical evidence connecting the accused to the crime was limited and explained by the defendant's theory of the case. So it seems to me that your argument about these, this corroborative evidence, really goes to one of the five prongs that we're to consider under Ocampo. Would you agree with that? That's probably a fair statement. Was there any physical evidence connecting your client to this crime? There was absolutely none. In fact, they never recover the gun in the case. There's inconsistent testimony actually about, at the scene of the crime, there's clearly .45 caliber bullets that are associated with a semi-automatic. One of the witnesses I think you told me no, and I'm just worried about your time. So can I That's okay. This is all I wanted to do, to answer my question. Thank you, Your Honor. I appreciate your indulgence. So in other words, if I give you all three of these factors for sake of argument under Ocampo, if I give you all of those and say that the corroborative evidence was really problematic, because that's what your brief cries out to me, then, Counsel, would you just indulge me and speak to the other four factors that Ocampo instructs us to look at? Because I think that's Judge O'Scanlan's question. Because that's what I would be left with if I buy the rest of your argument. Certainly, Your Honor. Okay. The importance of the testimony. So here we have straight from the prosecutor's mouth. April Romero reports an admission of a double murder from Petitioner in her statements given to the police. When you say straight from the prosecutor's mouth, I think you're referring to the argument in your brief. The closing argument. That the prosecutor said in closing that they told the jury you could rely on this alone to convict. Yes? Yes, Your Honor. Okay. What about the next factor? Whether the testimony was cumulative? Was her testimony cumulative? There are aspects of it that certainly were not. In so far as she gave testimony about the efforts that Petitioner and Arturo took to take the tinting off the car immediately after the murder, that's not cumulative at all. That stands alone. All the gun evidence all comes from April Romero. No other witness talks about it whatsoever. Now, what about the identifications? And the admission stands alone. I'm sorry, Your Honor? What about the identifications? Weren't there three I.D. witnesses? There are three I.D. witnesses. I mean, this goes back to the significance of the substantial evidence. But obviously there are suggestions of weaknesses in any one or maybe all three. But we can't ignore that, can we? You certainly can't ignore it, but you have to weigh it within the totality of the evidence. The question is not whether there was substantial evidence to convict Petitioner. The question is whether the error was harmless. So how much weight to give April's testimony in contrast to how weak the other admissible evidence was? And here the other I.D. evidence, although admissible, was substantially weak and problematic. Moreover, the I.D.s are also unclear. There's two people there. They see two people going to so we don't know if Arturo is the shooter, even if you think Petitioner was there with Arturo. You're still not sure who is the shooter. A lot of people make an I.D. and say that the shooter is short, with short hair, which is inconsistent with Petitioner's identification. He's six feet. He's right-handed. The shooter is left-handed. So there are these I.D.s. There's no one that looks at the six-pack and says he's the one. The identifications are not Petitioner is the one. They are the ten-year-old girl that says it's Abacook. And even then, I wonder if, does she mean he was the shooter or does she mean he was present and Arturo was the shooter? And we didn't hear. She doesn't say he's the shooter, he's the one with the gun. She just says it's Abacook. So maybe he was present. Maybe he was the non-shooter. Because there's two people there. And all we have is Ms. Munoz's testimony that this child is Abacook. Absolutely right. And you can't cross-examine her. It's an excited utterance and probably made an emergency situation. All right. But what about the man who, was it Hengis or Hengis, I'm mispronouncing his name, who saw this person cross in front of his car. He'd gone to high school with him and ultimately did identify him in court. Well, he identified him in court, but he doesn't match the identification given on the day of the crime. On the day of the crime, he describes somebody, first of all, carrying a huge gun, which is inconsistent with the murder weapon, looks like a paint, looks like a... A paint gun. A paint gun. Huge, he says, which is inconsistent with the murder weapon. So if it is Petitioner, he's not carrying the murder weapon. He also describes him as having short hair, which is also inconsistent with Petitioner. At that time, Petitioner was bald. And most importantly, I can't believe I forgot these facts, Petitioner doesn't just have bald, he's not just a bald Hispanic man. He has a tattoo across his forehead and on the back of his head. So he's easy to identify. Shoot or be, I think it's, shoot your shot and like dopey on the back. And nobody, nobody sees any of these tattoos on the alleged shooter that they saw. This is not some person that's hard to identify. And he's got two tattoos blaring on both sides of his head. So the shooter that Hengist describes, the day of the crime, actually does not meet the description of Petitioner. He doesn't have short hair. He's, you know, he's carrying a gun that's not the murder weapon. Can I ask you a question this way? Let's suppose you have a hundred pieces of evidence, disconnected pieces, all pointing towards guilt, but all of which have some warts. They all have some problems. Then you add April's testimony to that. And it has warts too. Certainly. Is April's testimony with the warts sufficient to upset the jury's verdict on the hundred pieces of evidence that also has warts? Well, that's why I think you have to look at how problematic the other identifications are. Every, no piece of evidence is perfect. And always subject to cross-examination and is, you know, you know, maybe with the exception of DNA evidence. And maybe not even then do you have a piece of perfect, a perfect piece of evidence. And I completely understand that. And I'm not arguing differently. So you have to look qualitatively. That's what I'm saying. You need to look qualitatively at each ID. And I think they're extremely problematic weighed against the weight of April's testimony, which is so compelling. She's a girlfriend. She's saying, I saw him right after the crime. I, you know, he, first Arturo has the gun in the hand. Then he has the gun in the hand. And then they, the cops coerce her. We're going to take your children away. You're an accessory of murder. We're going to, you, stop lying to us. She's ready to identify someone else. As the rumors are that, you know, a black man did it with a Spanish man. And all of a sudden, the cops keep telling her, you know, we're going to arrest you for murder. And all of a sudden the story changes. Sorry to interrupt you. I'm sorry. That's all right. All that information makes her testimony less probative, right? The fact that the police allegedly browbeat her into making the identification. And that goes before the jury too, right? Absolutely. Doesn't that lessen the prejudicial impact of her testimony? In part, it does. But you need to make a judgment call about how much you think the jury really put weight on April's testimony. That it was, in fact, much more compelling because of the details it had and because of the relationship she had to the petitioner versus the other identifications. And that's the qualitative analysis that you have to do when you're doing harmless error analysis. It is not a substantial evidence test. And with that, I'll use the rest of my time for rebuttal. Thank you, Your Honor. You've actually used your time, but we'll hear from opposing counsel. Thank you, Your Honor. Sure. Good morning, Your Honors. May it please the Court. Deputy Attorney General Theodore Cropley for Respondent and Appellee. First of all, in this case, the California Court of Appeal actually did do a chapter analysis here. It looked at the evidence as that is the way to determine whether there is an error under Chapman. Look at all of the evidence, and that's exactly what the California Court of Appeal did. Its use of the word must, I think, is appropriate because it's concluding, based on its review of all of the evidence, that any error that may have been committed was harmless beyond a reasonable doubt. But the petitioner would seem to have asked this Court to examine each piece of evidence in isolation. However, that's not what a jury is instructed to do, and that's not what a jury is instructed to look at all of the evidence, good and bad, and make its conclusion. But there is problems, right? There's problems with every other piece of evidence, isn't there? There are, as Judge Kogan said. There are warts on pieces. All of it. On all of it. And that's not uncommon in a criminal jury trial, that there's certain warts. That's why cross-examination can bring about those warts. But looking at the evidence as a whole, what the jury was faced with was three separate identifications of petitioner as the shooter here, as well as evidence linking petitioner to the gun, to the getaway car, and giving a motive to commit these. What did the jury hear about the fact that Ms. Munoz had not mentioned this 10-year-old child until just before trial? The jury knew about that. Certainly did. And that was... Knew that it was a late discovery, if you will. Yes, Your Honor. And cross-examination, that came out. And I think Ms. Munoz said, well, she thought the police had contacted Regina and would testify and things of that nature. So the jury, you know, one of the warts on this is what the jury heard, that this identification of Abacook was kind of late in the game. But it's important that, you know, Regina A., a 10-year-old girl with no stake in this, said it was Abacook. Didn't say, you know, Abacook was the accomplice or it was, you know, Abacook was there. It was Abacook. But that only gets in on a hearsay basis, right? The very epitome of excited others. Well, I'm not saying it's not admissible. I'm saying that that kind of hearsay may, in fact, be less probative than the little girl testifying herself, saying, I said it was Abacook because it was Abacook. I saw him shoot the guy. Certainly, Your Honor, because it comes through through Norma Munoz's testimony. I guess we need not spend too much time on what I've called the warts, because we all know the warts are there. We just need to focus on the relationship between April's warts and everybody else's warts. And my question to you is, if April is just, I'm doing a little too many analogies today, but if April is just the flea on this dog as you portray her, then why did the prosecutor on closing say you may convict just based on April alone? You shouldn't say that about any other witness. That's certainly true. The prosecutor emphasized that particular piece of evidence at trial. Absolutely. And, you know, that's what prosecutors do. They pick what they think is the strongest evidence. They don't know what will have the most impact on them. Yeah, I want to know what you just said. You said the prosecutor thought April was the strongest evidence, right? That's true. That is true, Your Honor. But, again, the prosecutor didn't rely solely on that. It emphasized that. But what also is in what the jury had in front of it is all of the other eyewitness identifications of this. And as the court said too, April Romero's testimony is as good as it was for the prosecution. Certainly did not come forth unchallenged here. In closing argument, defense counsel talked about how the police lied and threatened April, who initially about 15 times denied that it was Petitioner. Finally, under threat of prosecution and in prison time, she implicated Petitioner. The police told her what they wanted to hear, belittled her. So this wasn't just a straight confession from Petitioner. This came in with exactly how this identification was obtained. And it was, in a sense, cumulative to the other pre-identifications. How was it cumulative to the extent it constituted a confession? How was it cumulative? A confession as to April is identifying Petitioner as the shooter, after the police had done all it did to April during the interrogation. So April is identifying her boyfriend, Petitioner, as the shooter. And we also have three separate identifications implicating Petitioner as the shooter. The only evidence that we have contrary to it being Petitioner is certainly Desiree Robles, who denied she told Mr. Poplin that it was him, and Norma Munoz, who said she didn't get a good look at the guy. But what's important about Norma Munoz's testimony, not only that Regina A. identified Abacook as the shooter, is that Norma Munoz said, we live in a place where the less said, the better. And I think that could have a profound impact on the jury as to why people won't take the stand with Petitioner looking at them and point the finger. Rather, identification comes through people that don't have this fear. Thomas Hanges, who knew Petitioner from high school, seen him a couple of times. Regina A., 10-year-old girl, said it was Abacook, it was Abacook. And Desiree Robles telling David Poplin in a living room somewhere what actually happened. But the prosecutor didn't say you may convict solely on the basis of any one of those pieces you've just enumerated. Or even all of them. The prosecutor said you can convict on April Romero's testimony alone, right? Correct. The difficulty for us is when we do this brick substantial and injurious inquiry, we're looking back in hindsight and trying to figure out what was important and what wasn't. And when you have the prosecutor telling you what the most probative evidence is in the case from the prosecutor's opinion on the scene, we've got to give that some weight. You do, Your Honor. And I'm not shying away from what the prosecutor said, what the prosecutor relied on. But what the jury is instructed to do, also they're presumed to read and understand these instructions, is to look at the evidence as a whole. And so in order to find that April Romero's testimony had a substantial and injurious impact on the jury, on the verdict, the jury would have to ignore the other three eyewitness identifications, the evidence connecting petitioner to the gun, the getaway car, to motive. The jury would have to disregard all of that in order for April's testimony to have that significant impact on it. But here, although it was good evidence, the prosecutor emphasized this evidence, the jury was instructed to look at all of the evidence. And here, in determining whether the erroneously admitted evidence, the state court found, had the substantial and injurious impact, you have to find that the jury didn't, basically disbelieved everything else. And here we have powerful evidence identifying petitioner and connecting him to the crime. Looking at the Ocampo case, I think it's important, that does give us some general principles. But in Ocampo, where this court or a panel of this court found that an erroneous testimony did have such a substantial impact on the jury, Ocampo was very different from this case. In Ocampo, the defendant had an alibi. In this case, the defendant doesn't have an alibi. It's a mini defense, really. In Ocampo, the other properly admitted evidence included accomplice testimony. Here we don't have accomplice testimony. We have three separate identifications, again, warts and all, that come through identifying petitioner. But most importantly in Ocampo, one of the eyewitnesses himself confessed to committing the crime, twice to law enforcement and once to his girlfriend. And so certainly all of that evidence in front of the jury in determining whether the erroneously admitted testimony had an impact, certainly that's a far stronger case there to say, okay, because the other properly admitted evidence included some questionable testimony about whether petitioner in that case actually did it. Counsel, what is your answer to the question I asked about Ocampo, about the three-part test in Ocampo, the circumstances under which we should decide, apparently, and are obligated to by our precedent that corroborative evidence has no application, where there was reason for the jury to doubt the only eyewitness testimony, the third-party testimony was not exceptionally strong, and there was no physical evidence tying the defendant? Well, taking the last first, there was some physical evidence. The .45 that was used as the murder weapon was not recovered, but there were casings from a .45 caliber semi-automatic. But what tied that to the defendant, though? Well, the defendant had shown about a week earlier, shown an acquaintance, Mr. Monreal, a gun that at trial, Mr. Monreal said was at least similar to a .45 semi-automatic gun that he was shown. It was silver, and other witnesses put a silver gun in that of the shooter. So certainly it's not as if the actual weapon was introduced and identified. But as far as is there any physical evidence, yeah. The weight of that perhaps might not be particularly strong, but we do have some physical evidence. All right. What about the other two prongs? There was reason for the jury to doubt the only eyewitness testimony. It sounds like you're conceding there's some reason to doubt all of the other testimony. Well, I think, you know, as Ocampo said, there's reason to doubt the only other eyewitness testimony. You're right. You're right. Here there are three, at least three separate, or three separate eyewitness identifications. And which of them is free from doubt? Looking at them in isolation, they all have warts. They're not certainly free from doubt. And the prosecutor, or excuse me, the defense attorney in cross-examination brought those forward. But, again, in looking at this in the harmless error analysis to determine whether April Romero's testimony had this substantial and injurious impact, the jury would have had to disregard the physical evidence, the three eyewitness identifications, the other evidence linking the suitor, petitioner to the getaway car, giving a motive to commit these crimes. And looking at this evidence as a whole, which we must do in determining whether the erroneous submission of testimony was harmless or not, a rational jury would not have ignored all of that other evidence and concluded that it wasn't petitioner. But our question is whether or not the admission of April's testimony had a substantial and injurious effect in light of everything else that's on the other side of the scale. Right. And the only way that that admission of that testimony could have a substantial and injurious impact is if the jury ignored everything else. Well, I don't think that's correct, counsel. I mean, just as a matter of law, I don't think that's correct. The prosecutor, this goes to Judge Kogan's point, the prosecutor told the jury, you could convict on the basis of this testimony alone. And it was a confession by his girlfriend. Well, it was, again, it was through April saying petitioner told her he had done this. Right, right. None of the other evidence came close to that in weight, did it? Well, it didn't come close to that insofar as petitioner telling this person he did it. However, as I mentioned earlier, this, the introduction of April's testimony certainly was challenged. You know, how would that implication. Sure. So your point is it's wobbly, too. That's your point. It's probably the most problematic. Even though the prosecutor, and I agree completely with what the prosecutor did here. I'm not shying away from that. I think petitioner kind of implicated her shying away from that. Absolutely not. The prosecutor said what he or she said. But here, looking at the vigorous challenge to this, not only through Detective Shumway's testimony, but in closing argument, where April was browbeaten by the police, threatened with prosecution, denied it was petitioner 15 times before she finally said, yes, yes, it was. That, too, is something the jury looked at and considered along with everything, every other piece of evidence. So unless the Court has any further questions. Let's just check with Judge O'Scanlan. Sometimes it's hard to get in a word edgewise. Certainly. Anything further, Judge? I have one more question I want to ask you. There seems to be some confusion in the briefs about the applicable standard of review. In your argument today, and I think in your main brief, you agree we are doing a straight Brecht analysis and that an EDPA deference standard does not enter into this at all. In other words, we are not looking at whether reasonable jurists could disagree with the Chapman result reached by the state court. We are simply doing a Brecht analysis. Are you on board with that? Your Honor, not completely. Let me explain that. Just take a second to explain that. Certainly, circuit authority says that this court directly applies the Brecht analysis. However, my office in the past has argued that that is a misreading of Frye, that the court of appeal would only directly apply Brecht when the state court had not done any harmless error analysis. And so not conceding that ADPA doesn't apply in this case, but recognizing that circuit authority holds otherwise. Okay. When you say circuit authority now. Mayor Leo, I think, is a case that talks about because Brecht subsumes Chapman on review to do it directly. And certainly this court has done that in other cases. Counsel, you said that the state court was applying Brecht? No, Your Honor. It's really our task to apply Brecht, is it not? That is correct, Your Honor. If I misspoke, I apologize. The state court applied Chapman. And again, the state's position, my office's position in the past is that on habeas review, ADPA applies and it has to look at whether the court of appeal reasonably applied Chapman. But under any standard of review here, whether this court does an ADPA analysis of the court's Chapman, state court's Chapman analysis, or applies Brecht directly, which it has done in other cases, given the evidence that was presented, the totality of the evidence, that the introduction of April Romero's preliminary hearing testimony did not have a substantial injury impact on the group. So, Counsel, could you just answer Judge Kogan's question, what's your office's position in this case, please, about the appropriate standard? In this case. I know you think it doesn't matter. Yes, Your Honor. Yes, Your Honor. In this case, we urge the court to do an ADPA analysis, to look at the state's Chapman harmless error analysis, and apply ADPA. But you're just staking out that position because you recognize under Ninth Circuit precedent that position is foreclosed, right? That's correct. This court has foreclosed that in the past. Therefore. Maybe in your future briefs you can just note your position in a footnote so it becomes less ambiguous. We have to search. Certainly, Your Honor. And I apologize for that. That will be. We are not an in-bank court, are we? That is correct, Your Honor. Thank you. A fine line was walked, but I appreciate the court's concern. Very well. Thank you, Counsel. Let's hear from our opposing counsel, please. We asked an awful lot of questions and took up a lot of her time. Please put two minutes on the clock. Thank you, Your Honors. I think what's undeniable in this case is that April Romero was the main prosecutor, prosecution witness. It can't be denied. And she wasn't present. She wasn't present for the trial. And the confrontation clause isn't about whether she was cross-examined at the preliminary hearing. The confrontation clause is about her being present so the jury can see her, can look at her face and decide based on her facial expressions whether she's afraid of the petitioner or trying or self-interested in herself. We don't know. And we can't figure it out simply based on her preliminary hearing transcript and the cross-examination that happened there. We have to see her. We have to look at her. And so the question is how important was her testimony. And she was no doubt the main prosecution witness in this case. And she wasn't there. And that was a violation of the Constitution of the Sixth Amendment Confrontation Clause. And it harmed Petitioner. It was a substantial injurious effect. And for that, the conviction needs to be reversed even under the AEDPA. Thank you, Your Honors. Thank you to both counsel for your argument. It was very helpful. Thank you.
judges: Cogan, O'scannlain, Christen